UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DEANNA C., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:20-cv-1713-MJD-TWP |
| ) | |
| KILOLO KIJAKAZI, Acting Commissioner of ) | |
| the Social Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON JUDICIAL REVIEW**

Claimant Deanna C. requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability benefits.  For the reasons set forth below, the Court **REVERSES** the decision of the Commissioner.

**I. Background**

Claimant applied for a period of disability and disability insurance benefits ("DIB") in February 2016, alleging an onset of disability as of October 1, 2011.  [Dkt. 16-5 at 2.] Claimant's application was denied initially and upon reconsideration, and a hearing was held before Administrative Law Judge Gladys Whitfield ("ALJ") on December 4, 2018.  [Dkt. 16-2 at

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), after the removal of Andrew M. Saul from his office as Commissioner of the Social Security Administration on July 9, 2021, Kilolo Kijakazi automatically became the Defendant in this case when she was named Acting Commissioner of the Social Security Administration.

69.] During the hearing, Claimant amended her alleged onset date to August 10, 2014.[2] *Id.* at 74.  A supplemental hearing was held before the ALJ on April 25, 2019.  *Id.* at 32.  On May 30, 2019, ALJ Whitfield issued her determination that Claimant was not disabled.  *Id.* at 5.  After the Appeals Council denied Claimant's request for review, Claimant filed her Complaint on June 24, 2020, seeking judicial review of the ALJ's decision.  [Dkt. 1.]

## II. Legal Standards

To be eligible for benefits, a claimant must have a disability pursuant to 42 U.S.C. § 423. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To determine whether a claimant is disabled, the Commissioner, as represented by the ALJ, employs a sequential, five-step analysis: (1) if the claimant is engaged in substantial gainful activity, she is not disabled; (2) if the claimant does not have a "severe" impairment, one that significantly limits her ability to perform basic work activities, she is not disabled; (3) if the claimant's impairment or combination of impairments meets or medically equals any impairment appearing in the Listing of Impairments, 20 C.F.R. pt. 404, subpart P, App. 1, the claimant is disabled; (4) if the claimant is not found to be disabled at step three, and is able to perform her past relevant work, she is not disabled; and (5) if the claimant is not found to be disabled at step three, cannot perform her past relevant work, but can perform certain other available work, she is not disabled.  20 C.F.R. § 404.1520.  Before continuing to step four, the ALJ must assess the claimant's residual functional capacity ("RFC")

---

[2] Claimant's previous application for disability benefits was denied on August 9, 2014.

2

by "incorporat[ing] all of the claimant's limitations supported by the medical record." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).

In reviewing Claimant's appeal, the Court will reverse only "if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). Thus, an ALJ's decision "will be upheld if supported by substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019).

An ALJ need not address every piece of evidence but must provide a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This Court may not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Where substantial evidence supports the ALJ's disability determination, the Court must affirm the decision even if "reasonable minds could differ" on whether Claimant is disabled. *Id.*

### III. ALJ Decision

The ALJ first determined that Claimant did not engage in substantial gainful activity between the alleged onset date of August 10, 2014, and her date last insured, December 31, 2017. [Dkt. 16-2 at 7.] At step two, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar and cervical spine, degenerative disc disease of the hips, fibromyalgia, diminished vision in left eye, and obesity." *Id.* At step three, the ALJ found that Claimant's impairments did not meet or equal a listed impairment during the relevant time period. *Id.* at 10. The ALJ then found that, during the relevant time period, Claimant had the residual functional capacity ("RFC")

>to perform light work as defined in 20 CFR 404.1567(b) except: The claimant can lift, carry, push, or pull up to twenty pounds occasionally and up to ten pounds frequently. She can sit, stand, or walk for six hours in an eight-hour workday with normal breaks. She can occasionally climb ramps or stairs, but can never climb ladders, ropes, or scaffolds. She can occasionally balance or stoop, but can never kneel, crouch, or crawl. She can frequently reach forward and sideways, but can occasionally reach overhead. She can frequently push, pull, handle, finger, and feel. She must avoid all use of hazardous moving machinery and exposure to unprotected heights. The job must not require peripheral vision from her left eye.

*Id.* at 11.

At step four, the ALJ found that Claimant was able to perform her past relevant work as a legal secretary during the relevant time period. *Id*. at 17. Alternatively, at step five, the ALJ, relying on testimony from a vocational expert ("VE"), determined that Claimant was able to perform jobs that exist in significant numbers in the national economy. *Id*. at 18. Accordingly, the ALJ concluded Claimant was not disabled. *Id.*

## IV. Discussion

Claimant argues that the ALJ erred in two main respects. First, she argues that the ALJ's findings relating to her migraine headaches are erroneous. Second, she argues that the ALJ failed to consider the appropriate factors in deciding to give her treating physician's opinion little weight. These arguments are addressed, in turn, below.

### A.  Findings Relating to Migraine Headaches

At the first hearing, the ALJ asked Claimant "[w]hat was going on with [her] health that made [her] think [she was] disabled" when she applied for benefits. [Dkt. 16-2 at 79.] Claimant has many medical conditions, but the first problem she listed her in answer was that she had "very intense and very frequent" migraine headaches. *Id.* at 80. She testified that she suffered from migraines about four times a week, that they last "anywhere from four to 12 hours," and when she has one she has to cancel anything she has scheduled for the day and "lay down and

sleep them off." *Id.* at 83, 85. She further testified that Botox injections "cut them down probably by a third . . . [b]ut it became financially unattainable" because

> [t]he cost of Botox has gone up dramatically. It used to cost me a co-pay. You get the Botox injections like every three months. It's a quarterly procedure. . . . It used to cost me a co-pay of $300, but it's gone up and my co-pay is $1,800[3] now after my insurance. I can't afford it.

*Id.* at 86.

The ALJ found that Claimant's migraines did not satisfy the definition of "severe impairment" in that they "have not individually, or in combination with other impairments, caused more than minimal work-related difficulties for a continuous period of at least 12 months." [Dkt. 16-2 at 8.] The explanation the ALJ gave for this determination was the following: "The claimant has not alleged, and the record does not support, that migraines have caused more than minimal work-related difficulties, and the condition was controlled with medication and the claimant remained asymptomatic. (Ex. B24F/15)." *Id.* Given Claimant's testimony, quoted above, this explanation is perplexing. Claimant describes symptoms from her migraines that are incompatible with work four times per week. Further, the exhibit cited by the ALJ does not remotely suggest that Claimant "remained asymptomatic." To the contrary, the document is a progress note from neurologist Katherine Kobza, M.D., who diagnoses Claimant with "intractable migraine headaches." [Dkt. 16-8 at 31.] Dr. Kobza notes the following:

> [Claimant] is a 57 year old female with migraines, neuropathy, and chronic back pain who presents to get established with a new neurologist. She was previously followed by Dr. Josh Neucks and now that he is no longer practicing outpatient neurology is here to get established with a new neurologist. She was last seen by

---

[3] At the supplemental hearing, Claimant testified that she had had not been able to afford Botox treatments for "probably three or so years" because her copay had gone from $300 to $1,600. [Dkt. 16-2 at 60.] She further testified that her husband's gross income was approximately $40,000 per year. *Id.* at 61.

5

> Dr. Neucks in June and since her last visit has continued to have some ups and downs with regards [sic] to her migraines. She has had them for many years and her triggers tend to be weather changes and stress. They have seemingly improved somewhat since she quit working about 2 years ago. In August she was started on Almovig and she had an injection again in September and she felt as if things were continuing to improved [sic] but then in October and November she was unable to get the medication due to an insurance issue. She has now taken a December and January injection and feels that things might be a bit better. Her timolol was changed to atenolol when the timolo was taken off the market and she has not noticed any change in her headaches.

*Id.*[4] Claimant reporting that "things might be a bit better" is a far cry from the ALJ's finding that Claimant "remained asymptomatic."

The ALJ also noted, later in her decision, that medical expert Dr. Fisher, who specializes in family medicine, "surmised that the claimant's migraines were not considered a severe impairment" because "generally migraine headaches are relieved with medication. He stated that when migraine headaches are not relieved with medication, and are consistent, are [sic] not considered migraines, but rather could be tension headaches or some psychogenic issues." *Id.* at 13. Dr. Fisher did, in fact, so testify. He explained his opinion that Claimant's migraines were not a severe impairment as follows:

> She went like a year between Botox episodes. 16F1 they talk about reestablishing care with JWM Neurology. Last seen—this is December 2016—[5]she was last seen by them two years earlier. There was another about headaches. She had three to four per month while on Botox, that's at 3F4. Or 3F7. She's had them since her teenage years. So, considering she had them for years and years, and

---

[4] The Court notes that the ALJ correctly summarized this progress note later in her decision, *see* [Dkt. 16-2 at 13], so her citation of it in support of the statement that Claimant "remained asymptomatic" is perplexing.

[5] The document in question is actually dated September 2, 2016. It is a progress note from neurologist Joshua Neucks, M.D., of JWM Neurology. It notes that Claimant had last seen Dr. Neucks in December 2014, but that she had seen another doctor in the practice, Dr. Puzio, and his nurse practitioner, in February and May 2015, and that she had had a Botox injection in October 2015. It further notes that "[r]eview of notes indicate that there may have been some financial issues, etc., leading to her being lost to followup." [Dkt. 16-7 at 460.]

6

managed to, I guess, work until her onset date.  I didn't see where those would be severe.  She's lived with them for a long time and even three to four headaches a month, you can't say that—maybe they all occurred on the weekend and not during the weekday, so it wouldn't necessarily affect her ability to work.

[Dkt. 16-2 at 44.]  Dr. Fisher then had the following exchange with Claimant's counsel:

Q:  Do we have any evidence of how severe her migraines were when she was working?

A:  No.  Well, I don't know other than what she might have said to the doctors in the record.

Q:  And doctor, do you agree that headaches or migraines by themselves can be disabling for a person?

A:  For a period of time they can, when the person has a headache, yes.

Q:  And at what point doctor do you find that migraines or headaches are a severe problem?

A:  I can't give you a good answer to that.

Q:  Is it based on frequency and intensity?

A:  It can be.

Q:  And so at what frequency and intensity would you consider migraines a severe problem?

A:  I would consider it a severe problem if somebody was having migraines, chronic daily headaches.  And that could be relieved with some type of treatment.

Q:  So doctor, is there any reason to doubt that [Claimant] has migraines four times a month, even when she's having Botox treatments?

A: I don't know.  . . .  I think in order to have migraines, they should be relieved by something.  In other words, that's why there's migraine specific medication.  And people that don't get any relief from any medicine that's prescribed whatsoever, that say they have chronic headaches every day or migraines that can last two to three days at a time.  In my opinion, those are typically not migraines, they could be tension headaches or some kind of pain in their head that would even by related to some of their psychogenic problems.

> Q: And doctor what is your understanding of the definition of a severe impairment?
>
> A: It's an impairment that causes some type of functional limitations regarding work ability. It has to have lasted 12 months or be expected to last 12 months.
>
> Q: And so, even a migraine that was severe enough for a person to miss even one day of work, could be severe, could it not? Or could be classified as severe? If it happened for 12 months in a row?
>
> A: I'm not sure. I'm not sure.

*Id.* at 45-47.

Dr. Fisher's general understanding of how migraines typically present is inconsistent with the fact that Claimant's treating neurologist has diagnosed Claimant with **intractable** migraines (and, indeed, with the fact that there is a medical diagnosis code for intractable migraines, which Dr. Fisher appears to think do not exist). Further, even if Dr. Fisher is correct that Claimant's headaches are not properly called migraines, but rather tension headaches, they may still be a severe impairment, and even if the headaches are psychogenic, they still may be a symptom of a severe psychological impairment. Finally, Dr. Fisher's inability to articulate how he determines whether migraines are a severe impairment is problematic, as is his suggestion that having three or four migraines a month would not necessarily affect Claimant's ability to work because they might all occur on the weekend. *Cf. Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) ("Here, the ALJ appears to have concluded that incapacitating migraines once or twice a week would not be problematic because she would still have most of the week without such symptoms, but that essentially ignores the inability to schedule the incapacitating migraines. Absent a showing that she has a completely flexible work schedule in her past position as a reservation agent, the existence of symptom-free days adds nothing here.").

8

That said, however, "[s]tep two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019) (citing *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012)).  This is because "[e]ither way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." *Id.* (citing 20 C.F.R. § 404.1523; *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010)); *see also* [Dkt. 16-2 at 8] (ALJ acknowledging obligation to "evaluate[] the aforementioned non-severe impairments in combination with the claimant's severe impairments").  Therefore, the relevant question here is not whether the ALJ erred in determining that Claimant's migraines are not severe, but rather whether the ALJ erred in her assessment of Claimant's subjective symptoms relating to her migraines.

Claimant argues that the ALJ improperly discredited Claimant's testimony regarding those symptoms "based, at least in part, on assumptions and inferences that are not entirely supported by the record." [Dkt. 18 at 16.]  The Court agrees.

Pursuant to Social Security Rule 16-3p, "[the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." Social Security Rule 16-3p at *3.  Once established, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*  Social Security Rule 16-3p, which rescinded Social Security Rule 96-7p on March 28, 2016, requires that the ALJ assess a claimant's subjective symptoms, but not her credibility.  *Id.* at *2.  The "change in wording is meant to clarify that [ALJ's] aren't in the business of impeaching claimants' character; obviously [ALJ's] will continue to assess the credibility of pain *assertions* by applicants, especially as such assertions often cannot be either

9

credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original); *see also Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) (noting that an ALJ erred in "her belief that complaints of pain, to be credible, must be confirmed by diagnostic tests"). At stage two of the Social Security Rule 16-3p analysis, the ALJ considers the claimant's alleged symptoms in light of the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ acknowledged Claimant's testimony regarding her subjective symptoms, including her migraines, but concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this opinion." [Dkt. 16-2 at 12.] As best the Court can discern, those reasons are as follow.

First, the ALJ pointed to Claimant's activities of daily living, which the ALJ described as follows:

> She testified that on a typical day, she wakes up around 10:00 am and takes her time getting dressed. She then lets her dogs out and feeds them. She stated she watches a lot of television and she will take a short walk. She also has a friend with whom she speaks everyday. In her function report, the claimant also reported she prepares meals consisting of sandwiches and microwave foods. She also reported she can fold laundry, but needs help taking the clothes out of the machine due being [sic] unable to bend. The claimant testified that she is able to drive and will drive short distances such as to the grocery store and to doctors [sic] appointments.

*Id.* The ALJ then concluded that "[o]verall the undersigned finds the claimant's daily activities demonstrate a level of functioning that is consistent with the above modest residual functional capacity." *Id.*

The Seventh Circuit has "previously cautioned ALJs that there are critical differences between keeping up with activities of daily living and holding down a full-time job." *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (citing *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). The modest activities cited by the ALJ simply do not support the conclusion that Claimant would be able to work full-time. More importantly, however, is the fact that the activities described are not activities that Claimant can do while she is suffering from a migraine; Claimant testified that when she has a migraine, she has to cancel anything she has scheduled for the day and "lay down and sleep them off." [Dkt. 16-2 at 83, 85.] Therefore, in relying on these activities as evidence of Claimant's ability to work, the ALJ ignored the effect that Claimant's migraines have on her employability. *See id.* at 96-97 (vocational expert testimony that an employer's tolerances for absenteeism "would not exceed one day per month[, a]nd that assumes that the person could successfully complete a probationary period" of 30, 60, or 90 days).

Next, the ALJ found that "the objective medical evidence fails to fully support the claimant's allegations" regarding the "location, duration, frequency, and intensity of the claimant's pain or other symptoms." *Id.* Specifically with regard to migraines, the ALJ noted:

> On August 27, 2014, the claimant presented to Joshua Neucks, MD with chronic migraines and fibromyalgia. Dr. Neucks noted the claimant received Botox injections for her migraines every three months (Ex.B3F/4). The claimant reported the migraines are generally on the right-hand side and they originate from the occipital lobe or upper neck or occasionally from the right temporal region (Ex.B3F/4). The claimant reported the migraines usually last about six to eight hours, although some have lasted two to three days, and they occur three to four

11

times per month (Ex.B3F/4). In December 2014, Dr. Neucks noted that the claimant's last round of Botox injections was in January. However, the claimant has been continuing to take Topomax, which the claimant reported was helping with her migraines. He noted the claimant would like to continue with the Topomax (Ex.B3F/15). Dr. Neucks noted the claimant tolerated the Botox injections well, although she complained her eyelids became puffy. This was alleviated by injecting a smaller amount into a higher location. He noted the claimant has responded well to the Botox injections and the frequency of her headaches have decreased as a result (Ex.B3F/15). On October 17, 2016, the claimant presented to Dr. Neucks to resume Botox injections after not having had one since 2015, but decided to resume pursuant to chronic migraines (Ex.Bl8F/6). Despite the chronic migraines, a magnetic resonance imaging of the claimant's brain showed no decreased diffusion, no abnormal susceptibility signal, no abnormal parenchymal or leptomeningeal enhancement, and the major intracranial flow voids appear patent (Ex.B24F/l l). In January 2019, the claimant presented to Katherine Kobza, MD for her migraines who noted that the claimant's migraines were improving in September, but things became worse in October and November since she was unable to get her injections due to insurance issues. However, the claimant did get an injection in December and January, which seemed to improve things (Ex.B24F/15). The claimant testified that she was no longer able to get Botox injections due to the high co-pay. However, there is no evidence that claimant discussed these issues or sought out alternatives with her medial provider. There is no evidence that the claimant sought low or no cost medical care. Taking administrative notice, Indianapolis has a large public hospital that provides financial counseling and assists patients with payor resources (https://www.eskenazihealth.edu/programs/financial-counseling). Another provider in the area with special concern for the sick and poor is St. Vincent, who state that they are committed to caring for all people regardless of their ability to pay (https://www.stvincent.org/BillingServices)  There is no objective evidence of the cost of the co-pays. Dr. Fischer testified that generally migraine headaches are relieved with medication. He stated that when migraine headaches are not relieved with medication, and are consistent, are not considered migraines, but rather could be tension headaches or some psychogenic issues. Accordingly, he surmised that the claimant's migraines were not considered a severe impairment.

\*\*\*

The claimant suggests that she did not obtain some treatment due to the costs. However, there is no evidence that the claimant sought no lost or low cost care, or sought to make financial arrangements regarding care. The claimant testified that her husband was employed and earned approximately $40,000 per year. Additionally, the claimant testified that she did some traveling for pleasure during the relevant time period. The evidence shows that there is some money available to divert away from travel, and to dedicate to health care.

*Id.* at 13, 14.[6]  From this passage,[7] the Court can glean three distinct reasons the ALJ advanced for discrediting Claimant's testimony about the frequency and intensity of Claimant's migraine symptoms.  Each of them is problematic.

---

[6] The ALJ provides no citation to the record for Claimant's testimony regarding "traveling for pleasure," and the Court has been unable to locate any such testimony in the transcripts contained in the record.  The Court notes that "traveling for pleasure" does not necessarily require spending much money, while quarterly Botox injections would cost over 15% of Claimant's family's $40,000 yearly gross income.

[7] The Court recognizes that the ALJ also discussed the additional factors relevant to the evaluation of subjective symptoms as follows:

> As for factors that precipitate and aggravate the claimant's symptoms, she testified that light aggravates her migraine symptoms.  However, the undersigned considered the claimant's allegations to the extent they are reasonably consistent with the objective medical evidence, clinical findings, and her treatment history by limiting her to only a modest range of light exertional level work with limitations on the use of her left upper extremities.
>
> The undersigned has considered the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate symptoms.  The claimant reported taking Adderall, Vitamin D, Levothyroxine, Zofran, Xanax, Fentanyl, Imitrex, Topamax, Oxybutynin, Triamterene, Omeprazole, Fioricet, Pravastatin, Timolol, Lodocaine cream, Atrovent nose spray, Thinocort spray, Zyrtec, eye drops, Tizanidine, Baclofen, Annuity inhaler, Albuterol inhaler, andVicodin (Ex.Bl6E/l).  As for side effects, none were noted by the claimant.
>
> Turning to treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, the claimant testified she had surgery on her back. Furthermore, the claimant testified she has received Botox injections for her migraines.
>
> Regarding any measures, other than treatment, the claimant uses or has used to relieve symptoms, she testified that she lays down and takes naps for her migraines. She also testified that she keeps her house dark with dark pain and room-darkening drapes.  However, the record fails to demonstrate such measures are reasonably medically necessary for impairment related reasons in order for the claimant to perform sustained work activity consistent with the modest residual functional capacity set forth above.

13

First, the ALJ notes that "[d]espite the chronic migraines," Claimant's brain MRI was normal. But the brain MRI was not conducted to diagnose or confirm her migraines; it was conducted because her neurologist was concerned that she might have multiple sclerosis. [Dkt. 16-7 at 540]; *see also* [Dkt. 16-7 at 209] (otolaryngologist expressing same concern based on left-sided numbness and vision issues). As the Seventh Circuit has recognized:

> Doctors use MRIs *to rule out other possible causes of headache*—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis. See "Migraines: Tests and Diagnosis," Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/migraine-headache/basics/tests–diagnosis/con–20026358 (visited Aug. 13, 2014). This mistaken reading of the evidence illustrates why ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves. See *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir.2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was inconsistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

*Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) (emphasis in original). In this case, Dr. Fisher, the medical expert, did not mention the brain MRI as contributing to his determination that Claimant's migraines were not a severe impairment, and there is no other evidence of record that supports the ALJ's apparent assumption that the brain MRI findings are objective evidence that "fails to fully support the claimant's allegations." [Dkt. 16-2 at 12.]

---

[Dkt. 16-2 at 14.] Nothing in the discussion of these factors provides support for the ALJ's decision to discredit Claimant's testimony about her subjective symptoms related to her migraines.

14

Next, the ALJ points to the fact that Dr. Fisher "surmised[8] that the claimant's migraines were not considered a severe impairment." [Dkt. 16-2 at 13.] The Court has previously discussed the problematic nature of Dr. Fisher's supposition. In any event, Dr. Fisher's opinion is not "objective medical evidence," and therefore does not support the ALJ's conclusion that "the objective medical evidence fails to fully support the claimant's allegations." [Dkt. 16-2 at 12.]

Finally, and most problematically, the ALJ points to the fact that Botox injections decreased the frequency of Claimant's migraines but she nonetheless stopped getting them. Although the ALJ does not say so explicitly, presumably the ALJ's point was that if Claimant's migraines were as bad as she says they are, she would not choose to forgo treatment that made them happen less frequently. "[A]n ALJ may not draw negative inferences from a claimant's failure to seek treatment without first considering the individual's explanation," *McHenry v. Berryhill*, 911 F.3d 866, 873 (7th Cir. 2018) (citing S.S.R. 96-7p,[9] 1996 WL

---

[8] The ALJ herself appears to recognize that Dr. Fisher's opinion is not based on medical evidence, as the verb she chose—surmise—is defined as "[a]n idea based on weak evidence; conjecture." Black's Law Dictionary (11th ed. 2019).

[9] S.S.R. 96-7p has been replaced by S.S.R. 16-3p, which also provides:

> In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

S.S.R. 16-3p also recognizes that "[a]n individual may not be able to afford treatment and may not have access to free or low-cost medical services," and recognizes that the Commissioner "may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints."

374186, at *7, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements; *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014)). Implicitly acknowledging that rule, the ALJ recognized that, as noted above, Claimant testified that she was unable to afford the Botox treatments due to changes in her insurance. The ALJ then stated that "[h]owever, there is no evidence that claimant discussed these issues or sought out alternatives with her medial provider." [Dkt. 16-2 at 13.] Actually, there is evidence that Claimant discussed the issue of her inability to afford continued Botox treatments with her physicians; in fact, just a few sentences earlier, the ALJ acknowledged that Claimant's neurologist "noted that the claimant's migraines were improving in September, but things became worse in October and November **since she was unable to get her injections due to insurance issues**." *Id.*; *see also* [Dkt. 16-7 at 498] (neurologist note dated January 11, 2018, that "[h]er headaches did improved [sic] some with botox, but it has since become unaffordable"). The ALJ also stated that "[t]here is no evidence that the claimant sought low or no cost medical care, and took "administrative notice" that "Indianapolis has a large public hospital that provides financial counseling and assists patients with payor resources (https://www.eskenazihealth.edu/programs/financial-counseling). Another provider in the area with special concern for the sick and poor is St. Vincent, who state that they are committed to caring for all people regardless of their ability to pay (https://www.stvincent.org/BillingServices)." *Id.* Although again the ALJ does not explicitly explain what inference she is drawing from these facts that she has taken administrative notice of, to the extent that she is suggesting that free or low cost Botox injections were available to Claimant if she had just bothered to ask for them, that supposition is devoid of any support in the record, and also suggests that the ALJ lacks a fundamental understanding of how the healthcare system works in this country. In any case, the ALJ did not ask Claimant

16

whether she had explored possible ways to lower the cost of her Botox injections, and "it is the ALJ who carries the burden of developing the record." *Yurt v. Colvin,* 758 F.3d 850, 860 (7th Cir. 2014) (citing *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009)).[10]

To review, although it is far from clear, the ALJ appears to have discredited Claimant's testimony regarding the severity and frequency of her migraines in large part because Claimant failed to introduce evidence—without being asked for it—that she failed to seek low-cost Botox injections, although there is no evidence that she would actually have been able to obtain affordable Botox injections and there is evidence that she consistently sought out whatever treatment she could afford for her migraines. Far from creating a logical bridge from the evidence to her conclusions, the ALJ here appears to have built a house of cards based on assumptions that find no support in the record.[11] Remand therefore is necessary for the ALJ to reconsider her evaluation of Claimant's subjective symptoms and the effect of her migraines on her ability to work. As part of this evaluation, the ALJ should consider Claimant's work history.

---

[10] The Court notes that if the ALJ was not satisfied with Claimant's testimony regarding the cost of her Botox injections, the ALJ could, and should, have requested that Claimant provide "objective evidence" of that cost; that is not something that Claimant's attorney should have anticipated the need for.

[11] The Court notes that, in her brief, the Commissioner refers several times to the fact that "Plaintiff's counsel told the ALJ that Plaintiff's treating neurologist would be submitting a statement specifically regarding the headaches but no such opinion was forthcoming." [Dkt. 20 at 11]; *see also id.* at 1, 20. The ALJ did not cite the lack of such opinion evidence in her opinion, however, and "[o]ur review is limited also to the ALJ's rationales." *Jeske v. Saul,* 955 F.3d 583, 587 (7th Cir. 2020) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)). Nor did the ALJ mention the fact that "Plaintiff reported she had experienced chronic migraines since her teens and that prior to starting Botox treatment—which she first started in 2009—the frequency of her headaches was 'constant,'" but that she nonetheless worked until 2011." [Dkt. 20 at 9.] There is therefore no basis for the Commissioner's statement that this "fact" was "[c]rucial to the ALJ's decision." *Id.* In fact, there is evidence in the record that Claimant's headaches grew more severe over time. *See* [Dkt. 16-6 at 25] (headache questionnaire in which Plaintiff states that she started having headaches in high school and "they became worse as I got older").

*See Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history, but a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.  In assessing Stark's credibility about the disabling effects of her pain, the ALJ should have acknowledged Stark's efforts to continue work while experiencing significant pain and undergoing numerous surgeries and other treatments to relieve it.") (internal citations and quotation marks omitted).

### B.  Treating Physician's Opinion

Claimant also argues that the ALJ improperly discounted the opinion of her treating rheumatologist, Dr. Steven Neucks.  Dr. Neucks completed a "Physical Residual Functional Capacity Questionnaire" which sets forth far greater limitations than those found by the ALJ. [Dkt. 16-7 at 618.]  Because Claimant filed her application for benefits before March 27, 2017, the applicable law provides that a treating source's opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  If an ALJ does not give a treating source's opinion controlling weight, the regulations require the ALJ to consider "the treatment relationship, frequency of examinations, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citations omitted). As long as the ALJ considers these factors and minimally articulates her reasons, the Court will uphold her decision not to assign controlling weight to a treating physician's opinion.  *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *see also Moore*, 743 F.3d at 1127 (the ALJ must offer "good reasons" for discounting the opinion of a treating physician) (citations omitted).

The ALJ wholly failed to satisfy her obligation to consider Dr. Neucks's opinion and articulate her reasons for not giving it controlling weight. The only statement in the ALJ's decision regarding Dr. Neucks's opinion is as follows:

> The limitations articulated by Dr. Neucks regarding the claimants [sic] other limitations, such as use of her neck, and turning her head are unsupported by substantial evidence, and Neucks does not provide a basis or rationale for the limitations. Therefore, I accord this opinion persuasive weight only to the extent that it is supported by substantial evidence.

[Dkt. 16-2 at 16.] This is reversible error. On remand, the ALJ must reevaluate her consideration of Dr. Neucks's opinion and, if she determines it is not entitled to controlling weight, she must discuss the relevant factors and explain the weight she is assigning to the opinion and why. See *Scrogham v. Colvin*, 765 F.3d 685, 697-98 (7th Cir. 2014) ("The ALJ, however, did not discuss any of these factors in her opinion, so we cannot assess whether she appropriately chose not to give much weight to the treating physicians' opinions. The ALJ here should have addressed these factors in her opinion to enable us to review whether she engaged in the correct methodology.") (footnote omitted).

## V. Conclusion

For the reasons stated above, the Commissioner's decision is **REVERSED AND REMANDED for further proceedings consistent with this Order**.

SO ORDERED.

Dated: 18 NOV 2021

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.